UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

ANA YVONNE GONZALEZ,

                             Plaintiff,

          v.

CAROLYN W. COLVIN
*Acting Commissioner, Social Security
Administration*,

                       Defendant.

----------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-2159 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Ana Yvonne Gonzalez commenced the above-captioned action pursuant to

42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security

(the "Commissioner") denying her claim for disability insurance benefits. Plaintiff moves for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure,

claiming that the Administrative Law Judge Bruce MacDougall (the "ALJ") erred in (1) failing

to find that Plaintiff's spinal impairment was severe; (2) failing to find that Plaintiff's

impairment meets or equals the severity of the spinal disorders in Appendix 1 of the Social

Security Regulations; (3) determining Plaintiff's residual functional capacity ("RFC");

(4) finding that Plaintiff's statements about her symptoms were not entirely credible; and

(5) determining that there is employment available in the national economy that Plaintiff can

perform. (Pl. Mot. for J. on Pleadings, Docket Entry No. 11; Pl. Mem. in Supp. of Mot. for J. on

the Pleadings ("Pl. Mem."), Docket Entry No. 11-1.) The Commissioner cross-moves for

judgment on the pleadings, arguing that the ALJ's decision was supported by substantial

evidence and should be affirmed. (Comm'r Not. of Cross-Mot. for J. on Pleadings, Docket Entry

No. 16; Comm'r Mem. in Supp. of Cross-Mot. for J. on the Pleadings ("Comm'r Mem."),

Docket Entry No. 17.) For the reasons set forth below, Plaintiff's motion for judgment on the

pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is

denied.

## I. Background

Plaintiff was born in 1972 and attended high school through the eleventh grade.

(Certified Admin. Record ("R.") 19, 47, 95, 142, Docket Entry No. 8.) Plaintiff last worked in

May of 2011. (R. 47, 143.) Plaintiff has previously worked as a food preparer, a babysitter, a

cleaner, a sales worker at a bakery, and a dental office receptionist. (R. 28–30, 128–134, 143.)

On December 26, 2012, Plaintiff applied for disability insurance benefits, alleging that she was

disabled since May 6, 2011, due to left shoulder pain, back pain, pain in both feet, diabetes, high

blood pressure and an under-active thyroid. (R. 95, 141.) Plaintiff's application was denied.

(R. 46.) Plaintiff requested a hearing before the ALJ, which was held on October 26, 2012.

(R. 24–42, 59–60.) By decision dated March 20, 2014, the ALJ found that Plaintiff was not

disabled and denied Plaintiff's application. (R. 9–23.) On February 13, 2015, the Appeals

Council denied review of the ALJ's decision. (R. 1–5.)

### a. Plaintiff's testimony

Plaintiff lived with her mother and two of her three children, who were fourteen and

fifteen years old. (R. 31.) According to her testimony, Plaintiff is five feet six inches tall,

weighed 310 pounds, and is right-handed. (R. 32.) Due to a tear in her left shoulder, Plaintiff

was unable to use her left arm for lifting, and she had difficulty dressing. (R. 32.) Plaintiff was

undergoing physical therapy for her back, knees and left shoulder, but the physical therapy had

not relieved her pain. (R. 32–34.) Plaintiff also had a pinched nerve in her back, which affected

her ability to sit or stand for a long period of time, or walk more than three blocks without stopping. (R. 33–34.) Plaintiff had arthritis in both knees and a tear in her right knee, which caused pain when walking. (R. 34–35.) On a daily basis, Plaintiff's pain was an eight or nine on a scale of one to ten. (R. 41.) Plaintiff also had diabetes, which caused some numbness of her toes, but she did not believe the diabetes impacted her ability to function. (R. 36, 40.)

Plaintiff had difficulty cleaning the house and shopping for groceries, which she did with the assistance of her children. (R. 33.) She drove her children to school. (R. 37.) Plaintiff could sit for approximately thirty minutes and stand in one position for fifteen minutes. (R. 40.) Plaintiff used a cane all the time when going out. (R. 40.) Plaintiff could only lift five pounds or less. (R. 40.) Plaintiff took pain medication at night because it caused drowsiness and dizziness. (R. 41.)

### b. Medical evidence

#### i. Evidence before May 6, 2011, the alleged onset date

##### 1. Nu Image Medical Associates

Plaintiff was seen by Dr. Keith S. Leventhal, D.O., at Nu Image Medical Associates ("Nu Image") on November 2, 2010, as a follow-up to an emergency room visit in September of 2010. (R. 267–70.) Plaintiff had an abdominal infection, but "fel[t] fine" at the time of the examination. (R. 267.) Dr. Leventhal determined that Plaintiff had high blood pressure, high cholesterol and high levels of blood sugar. (R. 267.) Her thyroid testing was abnormal. (R. 267.) Plaintiff was taking the following medications: Enalapril maleate, Glimepiride, Januvia and Simvastatin; Dr. Leventhal provided refills. (R. 267–68.)

Dr. Leventhal examined Plaintiff and found her blood pressure to be 160/90. (R. 267.) Plaintiff, who was 64 inches tall, weighed 271 pounds. (R. 267.) Dr. Leventhal diagnosed Plaintiff with hypercholesterolemia, hypertension, abnormal thyroid tests and diabetes. (R. 270.)

Plaintiff returned to Nu Image on January 15, 2011, and was seen by Melissa Nocella, a physician's assistant. (R. 264–66.) Plaintiff had been compliant with her medications and denied any chest pain, shortness of breath or headache. (R. 264.) Plaintiff weighed 285 pounds, and her blood pressure was 160/100 in the left arm and 178/100 in the right arm. (R. 264.) Plaintiff was administered a dosage of Bystolic in the office, and her blood pressure after one hour was 148/96. (R. 264.)

On January 29, 2011, Plaintiff returned for an examination to check her blood pressure. (R. 261–63.) Plaintiff's blood pressure was 160/90 in the right arm and 160/100 in the left arm and her weight was 289 pounds. (R. 261.) Ms. Nocella's impression was that Plaintiff suffered from uncontrolled hypertension, and she prescribed Bystolic. (R. 262.) At a visit on March 12, 2011, Ms. Nocella determined Plaintiff's blood pressure to be 158/96 in the right arm and 154/94 in the left arm, and her weight to be 287 pounds. (R. 258.) Ms. Nocella increased Plaintiff's Enalapril dosage, which Plaintiff was already prescribed and which Dr. Leventhal had previously refilled. (R. 260.)

On April 30, 2011, Plaintiff's blood pressure was 190/90 in the right arm and 186/90 in the left, and she weighed 294 pounds. (R. 255.) Ms. Nocella's impression was that Plaintiff suffered from hypertension, diabetes and dyslipidemia, or high cholesterol. (R. 257.) Ms. Nocella increased Plaintiff's Enalapril dosage and had Plaintiff begin taking Hydrochlorothiazide. (R. 257.)

### ii. Evidence after May 6, 2011, the alleged onset date

### 1. Nu Image Medical Associates

On May 11, 2011, Plaintiff saw Ms. Nocella for a follow-up visit after Plaintiff had to visit the emergency room visit for an infected abscess and cellulitis on her face two days prior. (R. 252–54.) Plaintiff's blood pressure was 184/100 in the right arm and 192/100 in the left, and she weighed 291 pounds. (R. 252.) Ms. Nocella observed that Plaintiff had uncontrolled hypertension. (R. 253.)

On May 31, 2011, Scott Brown, D.O., Plaintiff's primary care physician, saw Plaintiff to determine whether she could obtain a medical clearance to return to work. (R. 248–51.) Plaintiff had been treated for a Methicillin-resistant Staphylococcus aureus ("MRSA") infection, and reported feeling better. (R. 248.) Her blood pressure was 154/98 in the right arm and 160/100 in the left, and she weighed 286 pounds. (R. 248.) Dr. Brown cleared Plaintiff to return to work as a food server at a school. (R. 250.)

On August 1, 2011, Plaintiff saw Dr. Brown to have her blood pressure and sugar level checked. (R. 245–47.) Plaintiff's blood pressure was 140/70, and she weighed 288 pounds. (R. 245.) Dr. Brown observed that Plaintiff was in no apparent distress. (R. 246.) Dr. Brown recommended aerobic exercise, a low-carbohydrate diet for diabetes, and a low-sodium diet for hypertension. (R. 247.) He established a treatment plan including further blood work, a podiatry consultation and an orthopedic consultation. (R. 247.)

On November 8, 2011, Dr. Brown examined Plaintiff. (R. 236.) Plaintiff told Dr. Bloom that her endocrinologist had adjusted her medication and added a new thyroid medication. (R. 236.) Plaintiff's blood pressure was 128/84. (R. 236.) Dr. Brown noted varicosities, or distension, in Plaintiff's extremities. (R. 238.) Dr. Brown diagnosed Plaintiff with diabetes,

high lipids, hypothyroid and varicosities. (R. 238.) Dr. Brown noted that Plaintiff was seeing a podiatrist and had an appointment with an orthopedist, and counseled Plaintiff regarding aerobic exercise and diet. (R. 239.)

Plaintiff was seen by Ms. Nocella for refills of her medications on February 22, March 24 and April 17, 2012. (R. 232–35.) At each appointment, Plaintiff stated that she felt well. (R. 228, 232.) Her blood pressure was respectively 142/80, 150/80, and 140/84. (R. 225, 232, 235.) Plaintiff's weight ranged from 297 to 300 pounds. (R. 225, 232, 235.) Plaintiff admitted that she was not compliant with her diabetic diet and was counseled regarding aerobic exercise and dieting. (R. 225, 227, 228.) Plaintiff was diagnosed with diabetes mellitus and was told to return to her endocrinologist and to continue to have her blood examined to track her blood sugar levels. (R. 227, 230, 234.)

On June 6, 2012, Plaintiff complained to Ms. Nocella that she had experienced swollen feet for one week and cuts on her ankles for three weeks, which cuts Plaintiff believed were infected. (R. 221.) Plaintiff's blood pressure was 152/94 in the right arm and 150/90 in the left, and she weighed 298 pounds. (R. 221.) Examination of Plaintiff's extremities revealed a barely detectible pitting edema over the lower third of her tibia and ankle. (R. 223.) Plaintiff had good capillary refill. (R. 223.) Ms. Nocella observed several scabbed lesions with surrounding minimal erythema. (R. 223.) Plaintiff also had tinea pedis, a common skin infection caused by fungus and often referred to as "Athlete's Foot," between toes and paronychia of the toenails. (R. 223.) Ms. Nocella's impression was that Plaintiff suffered from lower extremity edema and cellulitis; Plaintiff was prescribed Lasix and Bactrim. (R. 223–24.) Ms. Nocella advised Plaintiff to follow-up with her podiatrist and to undergo lower extremity doppler testing.

(R. 224.)  Records show that lower extremity doppler testing of both Plaintiff's legs, conducted on June 29, 2012, demonstrated normal results.  (R. 287.)

On August 28, 2012, Plaintiff saw Dr. Brown and complained of left shoulder pain for over one month.  (R. 216–20.)  Plaintiff stated that Advil had been helping her to manage the pain.  (R. 216.)  Plaintiff's blood pressure was 130/80, and she weighed 308 pounds.  (R. 216.)  On examining Plaintiff, her extremities revealed decreased range of motion and point tenderness of the left shoulder.  (R. 218.)  Dr. Brown diagnosed Plaintiff with hypertension, diabetes, left shoulder pain and arthritis.  (R. 218.)  Dr. Brown advised Plaintiff to consult with an orthopedist for her left shoulder, lower-left back and left leg pain.  (R. 219, 295.)

On September 11, 2012, Dr. Brown determined that Plaintiff's blood pressure was 130/80, and that she weighed 308 pounds.  (R. 213.)  Based on blood test results, Dr. Brown noted that Plaintiff had an increased white blood cell count and that her diabetes was uncontrolled.  (R. 215.)

On January 4, 2013, Plaintiff was examined by Dr. Leventhal.  (R. 209–12.)  Plaintiff's blood pressure was 144/90 in the right arm and 150/94 in the left, and she weighed 318 pounds.  (R. 209.)  Dr. Leventhal conducted a musculoskeletal examination, which revealed normal strength and gait.  (R. 211.)  Dr. Leventhal diagnosed hypertension, hyperlipidemia, diabetes and diabetic nephropathy, or kidney disease.  (R. 211.)

On January 18, 2013, Dr. Leventhal examined Plaintiff and determined that her blood pressure was 150/90 in the right arm and 146/88 in the left, and that she weighed 319 pounds.  (R. 202.)  Dr. Leventhal's musculoskeletal examination of Plaintiff revealed normal strength and gait, and no sensory or motor abnormalities.  (R. 204.)  Dr. Leventhal diagnosed Plaintiff with

hypertension, hyperlipidemia, diabetes, diabetic nephropathy and "left shoulder/back pain." (R. 204–05.)

### 2. Nassau Cardiology, PC

On June 8, 2011, Plaintiff was seen by Dr. Fred Fefer, M.D. for a cardiovascular consultation, on a referral from Dr. Brown. (R. 273–74.) Plaintiff described her history of hypertension, diabetes and hyperlipidemia. (R. 273.) Plaintiff reported a limited exercise tolerance, but denied overt chest discomfort or shortness of breath. (R. 273.) Plaintiff was taking five medications to treat diabetes and high blood pressure. (R. 273.)

Plaintiff weighed 290 pounds. (R. 273.) Dr. Fefer's examination of Plaintiff's lungs revealed diminished air entry into both bases, with no rales or rhonchi. (R. 273.) Plaintiff's heart revealed a regular rate and rhythm with S1 and S2 sounds, with no gallop, rub, heave or thrill. (R. 273.) An electrocardiogram ("EKG") showed sinus tachycardia, normal axis and intervals, and non-specific ST/T wave changes. (R. 274.) Dr. Fefer concluded that, given Plaintiff's morbid obesity, her tachycardia may be due to severe deconditioning. (R. 274.) Dr. Fefer stated that Plaintiff would also undergo an echocardiogram and Holter monitoring studies, and blood testing to include thyroid levels. (R. 274.) Blood testing results from June 10, 2011 revealed that Plaintiff's thyroid hormone levels were all within reference ranges. (R. 276.)

### 3. Livingston Footcare Specialists

On August 29, 2011, Plaintiff was seen at Livingston Footcare Specialists for an initial consultation regarding her diabetic foot pain. (R. 279–81.) Plaintiff complained of numbness in both of her second toes. (R. 279.) An examination revealed decreased epicritic sensation between both second toes, but no open lesions, edema or ecchymosis. (R. 280.) X-rays showed

retrocalcaneal heel spurs.  (R. 280.)  The examining doctor diagnosed Plaintiff with diabetes with neuropathy (both second toes).  (R. 280.)

On January 19, 2012, Dr. Joseph Alencherry, D.P.M, saw Plaintiff for an examination. (R. 282–83.)  Plaintiff reported improvement of the numbness and pain in her forefoot and that the tinea pedis responded to topical gel.  (R. 282.)  On examining Plaintiff, Dr. Alencherry observed that Plaintiff had decreased maceration in the interdigital spaces on both her feet, and that her feet showed no sign of bacterial infection.  (R. 282.)  Dr. Alencherry observed normal sensation of the distal toes and minimally decreased vibratory sensation, an improvement from the prior examination, when Plaintiff had no sensation.  (R. 282.)  Plaintiff reported that she had no pain of the second metatarsophalangeal joint of the right foot.  (R. 282.)  Dr. Alencherry noted that, on palpitation, Plaintiff had a positive Tinel sign, used to detect irritated nerves, over the tarsal tunnel region.  (R. 282.)  Dr. Alencherry diagnosed Plaintiff with improved tinea pedis, diabetes with neuropathy, improving rule-out neuritis, or an inflammation of nerves, improved second metatarsophalangeal ("MPT") joint bursitis/capsulitis and rule-out tarsal tunnel syndrome.  (R. 282.)  Plaintiff also got a corrective brace, a custom-made orthosis.  (R. 282.)

Dr. Alencherry saw Plaintiff for podiatric follow-up on August 24, 2012.  (R. 288–89.) Dr. Alencherry observed macerations of the third and fourth interdigital spaces of both feet, but saw no signs of acute bacterial infection.  (R. 288.)  Dr. Alencherry treated Plaintiff's foot pain with an injection of lidocaine.  (R. 288.)  Plaintiff had normal sensation to the distal toes bilaterally, but vibratory sensation that was still slightly decreased.  (R. 288.)  Plaintiff had pain on palpation of the second MPT joint of the right foot.  (R. 288.)  Dr. Alencherry diagnosed Plaintiff with chronic recurrent tinea pedis, diabetic neuropathy and improving neuritis secondary to chronic second MTP joint bursitis.  (R. 288.)

On December 12, 2012, Dr. Alencherry saw Plaintiff for a podiatric follow-up. (R. 300–01.) Dr. Alencherry examined Plaintiff and observed that she had decreased but continued pain upon palpation of her right foot, including pain with plantar flexion and inversion against resistance. (R. 300.) Dr. Alencherry diagnosed Plaintiff with tinea pedis, posterior tibial "tendinitis and synovitis" of the right foot, and "collapsing pes plano valgus deformity, bilaterally with excessive pronation." (R. 301.) Dr. Alencherry administered injections of lidocaine and decadron for Plaintiff's pain. (R. 301.)

Dr. Alencherry saw Plaintiff for a podiatric follow-up on January 8, 2013. (R. 305.) Plaintiff had no maceration of any of the interdigital spaces. (R. 305.) Plaintiff had severely dry skin. (R. 305.) Dr. Alencherry diagnosed Plaintiff with xerosis, dermatitis and improved tinea pedis. (R. 306.) On May 9, 2013, Dr. Alencherry observed decreased dry skin on Plaintiff's heels. (R. 333–34.) Dr. Alencherry diagnosed Plaintiff with xerosis, dermatitis and improved tinea pedis. (R. 334.)

### 4. Optimum Life Physical Therapy

On September 19, 2012, Susan DeMarco, P.T., evaluated Plaintiff for physical therapy at Optimum Life Physical Therapy. (R. 294, 296.) Plaintiff reported her pain as "10/10" and reported that she was taking over-the-counter pain medications. (R. 294.) Ms. DeMarco observed that Plaintiff had an antalgic gait and reduced pelvic range of motion. (R. 294.) Plaintiff was given a treatment plan for twice-weekly physical therapy for four to six weeks, to include hot and cold packs, electrical stimulation and massage. (R. 294.) Plaintiff attended fourteen sessions of physical therapy through February 21, 2013. (R. 310–18.)

### 5. Action Sports Medicine & Rehabilitation

On May 28, 2013, Plaintiff was examined by Dr. Sunil Butani, M.D., and began treatment for her lower back pain at Action Sports Medicine & Rehabilitation. (R. 351, 357.) Plaintiff described a two-year history of lower back pain and explained that the pain was "constant" and "sharp and stabbing." (R. 357.) The pain radiated into the left lower extremity from the buttocks to the knee, but did not cause tingling sensations in her lower extremities. (R. 357.) Plaintiff reported that the pain increased after "prolonged standing or ambulation" as well as with bending. (R. 357.) Dr. Butani examined Plaintiff and observed tenderness to palpation across her lumbar spine. (R. 351.) Plaintiff had a decreased range of lumbar motion, notably with flexion and extension. (R. 351.) Plaintiff's motor power was "5/5" in the right lower extremity and "4/5" in the left lower extremity. (R. 351.) Plaintiff's deep tendon reflexes were absent bilaterally. (R. 351.) Plaintiff's "sensation to pinprick [was] decreased in the left lower extremity." (R. 351.) A Patrick's test, used to evaluate the hip joint, was positive bilaterally, indicating pain at the joint. (R. 351.) Plaintiff's straight leg raising was positive on the left side at about 45 degrees. (R. 351.) Dr. Butani's diagnosis was "low[er] back pain likely secondary to disc herniations" and radiculopathy. (R. 351.)

Dr. Butani stated that Plaintiff would be given a nerve conduction velocity studies and an electromyogram ("EMG"). Results of June 10, 2013 nerve conduction velocity studies revealed evidence of moderate bilateral median neuropathy at the wrist, affecting both sensory and motor components. (R. 335–41.) The results showed that Plaintiff's lower extremities were within normal limits. (R. 335.) Dr. Butani performed an EMG on June 13, 2013, to measure the electrical activity of Plaintiff's lower extremities and lumbar paraspinals, including gluteus maximus, hamstrings, quadriceps and other muscles. (R. 342.) Dr. Butani explained that the

results were consistent with L5-S1 radiculopathy, and showed no signs of peripheral nerve entrapment or diabetic neuropathy.  (R. 342; *see* R. 343–44.)

On July 9, 2013, Dr. Butani conducted a follow up exam of Plaintiff and determined that her lower back pain was unchanged despite physical therapy.  (R. 350.)  Plaintiff described it as a "constant stabbing pain," radiating down her left lower extremity.  (R. 350.)  Dr. Butani identified that Plaintiff had tenderness to palpation across her lumbar spine, she had decreased range of lumbar motion most notably with flexion, her motor power was "5/5" (full) in the right lower extremity and "4/5" in the left lower extremity, and she walked with an antalgic gait.  (R. 350.)  On July 30 and August 13, 2013, Plaintiff received lumbar epidural steroid injections at the L5-S1 level.  (R. 352–56.)

On August 19, 2013, Plaintiff was examined by Dr. Jeffrey Chacko, M.D.  (R. 349.)  Plaintiff reported that she had no significant improvement in her pain from the two prior lumbar epidural steroid injections.  (R. 349.)  Dr. Chacko observed that Plaintiff had mild tenderness in the paravertebral region, severe tenderness of the left piriformis muscle, and mild tenderness over the trochanteric bursa and sacroiliac joint region.  (R. 349.)  Plaintiff had a "full" range of motion, and her straight leg raising was equivocal.  (R. 349.)  Dr. Chacko diagnosed Plaintiff with lower back pain secondary to left piriformis syndrome with sacroiliac joint dysfunction with component of lumbar radiculopathy.  (R. 349.)  Dr. Chacko stated that Plaintiff would be scheduled for left piriformis and sacroiliac joint injections for her pain.  (R. 349.)

On November 18, 2013, Dr. Chacko examined Plaintiff and made similar findings.  (R. 347–48.)  Dr. Chacko noted tenderness in Plaintiff's lumbar spine and severe tenderness in the left piriformis muscle.  (R. 347.)  He assessed lower back pain secondary to left piriformis

syndrome with sacroiliac joint dysfunction, and he administered a left piriformis muscle corticosteroid injection for Plaintiff's pain. (R. 347–48.)

On December 4, 2013, Plaintiff was examined by Dr. Butani. (R. 346.) Dr. Butani observed tenderness to palpation across Plaintiff's lumbar spine and upper buttocks, and decreased range of lumbar motion secondary to pain. (R. 346.) Plaintiff's motor power was "5/5" (full) both lower extremities. (R. 346.) Plaintiff walked with an antalgic gait. (R. 346.) A Patrick's test was positive for increased pain in the buttocks. (R. 346.) Dr. Butani indicated that Plaintiff would be given further steroid injections in the bilateral sacroiliac joint and left piriformis muscle. (R. 346.)

On December 23, 2013, Dr. Chacko examined Plaintiff. (R. 345.) Plaintiff reported continued severe pain, with occasional numbness in the left buttock and left leg. (R. 345.) Plaintiff refused further injections in the sacroiliac joint and left piriformis muscle. (R. 345.) Plaintiff related having difficulty walking, standing and bending secondary to pain. (R. 345.) Dr. Chacko observed that Plaintiff's lumbar spine revealed tenderness in the upper buttock and piriformis muscle, and mild tenderness in the posterior superior iliac spine. (R. 345.) Plaintiff's range of motion was decreased in flexion by 30%, but had a full range of motion in extension. (R. 345.) Sacroiliac loading signs, testing Plaintiff's hip joint strength, and Faber's test, also used to evaluate the hip joint, were positive. (R. 345.) Plaintiff's gait was antalgic. (R. 345.)

### 6.  Island Musculoskeletal Care

At the referral of Dr. Nabil Farakh, D.O., of Island Musculoskeletal Care, Plaintiff received a magnetic resonance imaging ("MRI") test of her left shoulder on January 24, 2013.[1]

---

[1]  It appears that Plaintiff began treatment with Dr. Farakh prior to this MRI, but the record does not contain any treatment notes prior to this date.

The MRI showed acromioclavicular joint arthropathy, or joint disease, and a high-grade tear of the anterior fibers of the infraspinatus back muscle, with a complete tear extending into the posterior fibers of the supraspinatus upper back muscle. (R. 196–97.) A February 7, 2013 MRI of Plaintiff's lumbar spine revealed no herniated disc, significant canal stenosis or intradural lesions. (R. 194–95.) At the L3–L4 level, there was mild spinal stenosis, grade 1 spondylolisthesis and moderate facet arthritis. (R. 194.) There was mild asymmetric left foraminal narrowing. (R. 194.) At the L4–L5 level, there was mild to moderate degenerative facet arthritis, right greater than left with mild asymmetric compression of the exiting right L4 root noted. (R. 194.) At the L5–S1 level, the MRI showed a mild left proximal foraminal bulging disc annulus, causing very mild compression of the exiting left L5 root. (R. 194.)

On December 5, 2013, Plaintiff saw Dr. Farakh for a follow-up visit. (R. 321–22.) Dr. Farakh noted that he had seen Plaintiff in the past regarding shoulder pain and lower back pain, and that her primary concern had become "a new condition of bilateral knee pain." (R. 321.) Plaintiff reported swelling and locking of both knees, the right more than the left, with instability in both knees. (R. 321.) Dr. Farakh examined Plaintiff's knees and identified diffuse tenderness of both knees, mild joint effusion and crepitus. (R. 321.) Plaintiff's knees both had a limited range of motion, secondary to pain; the range of motion of the right knee was 5 to 105 degrees with pain, and the range of motion of the left knee was 5 to 115 degrees with pain. (R. 321.) McMurray testing, showing tears in the meniscus of the knee, was positive. (R. 321.) X-rays showed degenerative changes of both knees with mild joint effusion. (R. 321.) Dr. Farakh diagnosed bilateral knee pain with osteoarthritis, rule-out internal derangement. (R. 321.) Dr. Farakh authorized MRIs of Plaintiff's knees, and he recommended knee braces, physical therapy, pain medication and a limit on Plaintiff's heavy activity. (R. 321.) A

December 19, 2013 MRI of Plaintiff's left knee revealed joint effusion and a popliteal cyst with grade three chondromalacia patella — deteriorating cartilage — and mild osteoarthritis of the knee. (R. 324–25.) There were no tendon, meniscal or ligament tears identified. (R. 325.) A December 23, 2013 MRI of Plaintiff's right knee revealed a tear of the medial meniscus and a small popliteal cyst. (R. 326–27.)

On January 8, 2014, Plaintiff visited Dr. Farakh for a follow-up visit, and she reported no improvement in her knee pain. (R. 319.) Dr. Farakh observed that Plaintiff continued to have tenderness of the bilateral knees, limited range of motion of bilateral knees and crepitus with range of motion. (R. 319.) Dr. Farakh diagnosed Plaintiff with bilateral knee pain and osteoarthritis with medial meniscus tear of the right knee. (R. 319.) He administered an injection of Depo-Medrol mixed with lidocaine and cortisone into the left knee to manage Plaintiff's pain. (R. 319.) Dr. Farakh recommended that Plaintiff undergo three to four weeks of physical therapy, and noted that he had discussed with Plaintiff the possibility of surgery if the symptoms in her right knee did not improve. (R. 319.)

### c. Dr. Jerome Caiati, consultative medical examiner

On March 1, 2013, Jerome Caiati, M.D. examined Plaintiff at the request of the Social Security Administration. (R. 190–93.) Plaintiff described her history of hypertension, diabetes, hyperlipidemia, hypothyroidism, left shoulder pain and lower back pain, and listed thirteen current medications she was prescribed to manage her diabetes and blood pressure. (R. 190.) Plaintiff explained that she was able to cook and go shopping, but could not clean or do laundry because of pain in her left shoulder and lower back. (R. 190–91.) Plaintiff could shower and dress herself, and she watched television and read. (R. 191.)

Dr. Caiati examined Plaintiff.  (R. 191.)  Plaintiff weighed 317 pounds and her blood pressure was 130/80.  (R. 191.)  He observed that Plaintiff was obese and did not appear in any acute distress.  (R. 191.)  Plaintiff's gait was normal, she walked on her heels and toes without difficulty, and she used no assistive devices.  (R. 191.)  Plaintiff squatted half-way, holding on and complaining of lower back pain.  (R. 191.)  Her stance was normal.  (R. 191.)  Dr. Caiati observed that Plaintiff did not need assistance changing for the examination or getting on and off the examination table.  (R. 191.)  Plaintiff complained of lower back pain when she rose from her chair, but she had minimum difficulty doing so.  (R. 191.)

Plaintiff's lumbar range of motion was: flexion to 70 degrees with complaints of lower back pain; extension to 20 degrees; lateral flexion to 30 degrees; and rotation to 30 degrees. (R. 192.)  Plaintiff's straight leg raising while sitting was 90 degrees on the right and 80 degrees on the left, with complaints of lower back pain.  (R. 192.)  She had a full range of motion of the shoulders bilaterally.  (R. 192.)  Plaintiff's joints were stable and nontender, with no evident subluxations, contractures, ankylosis or thickening of the joints.  (R. 192.)  Her joints also showed no redness, heat, swelling or effusion.  (R. 192.)  Plaintiff's deep tendon reflexes were physiologic and equal in all extremities.  (R. 192.)  Her motor strength was "5/5" (full) in all extremities.  (R. 192.)  Plaintiff's hand and finger dexterity was intact and grip strength was "5/5" (full) bilaterally.  (R. 192.)

Dr. Caiati diagnosed Plaintiff with obesity and history of hypertension, diabetes, hyperlipidemia, hypothyroidism, left shoulder pain "diagnosis unclear," and lower back pain "diagnosis unclear."  (R. 192.)  Dr. Caiati opined that Plaintiff had unrestricted abilities to sit, stand, walk, reach, push, pull and climb.  (R. 193.)  He further opined that Plaintiff would have a "minimum to mild" limitation bending and lifting, due to lower back pain.  (R. 193.)

### d.  Additional evidence

#### i.  Function report

On February 21, 2013, Plaintiff completed a function report as part of her application for disability benefits.  (R. 117–25.)  Plaintiff was living in a house with her family.  (R. 118.) Plaintiff spent her days making breakfast for her children, taking them to school and sometimes running errands or doing household chores.  (R. 117.)  With the assistance of her children, Plaintiff cared for her pet dog, and fed and walked him in the morning.  (R. 117.)  Plaintiff sometimes had problems sleeping due to pain.  (R. 117.)  Plaintiff took longer to get dressed because of the pain.  (R. 117.)  Her back hurt when standing for a long time in the shower, and her left shoulder hurt when brushing and tying up her hair.  (R. 117.)

Plaintiff prepared meals daily, such as rice, pasta, meat and chicken.  (R. 119.)  It look her longer to prepare meals because of her need to sit when her back hurt.  (R. 120.)  Plaintiff could drive, and left the house when she needed to run errands or go shopping.  (R. 120.) Plaintiff shopped in stores for groceries, clothing and household items once or twice a week for two to three hours.  (R. 121.)  Plaintiff's hobbies and interests consisted of reading the newspaper, watching television and doing crossword puzzles.  (R. 121.)  Her pain did not limit her ability to do these activities because she did them while sitting.  (R. 121.)  Plaintiff socialized on the telephone or computer, and she attended church weekly.  (R. 122.)

Plaintiff's ability to lift was limited due to back pain.  (R. 122.)  Her ability to stand and walk was also limited, but she had no problems sitting.  (R. 122–23.)  Climbing stairs, kneeling and squatting caused Plaintiff back pain.  (R. 123.)  Reaching caused Plaintiff left shoulder pain. (R. 123.)  Plaintiff used a cane, which was not prescribed by a doctor, when walking long distances.  (R. 123.)  Plaintiff could walk for about five to ten minutes before needing to stop and

rest for one or two minutes.  (R. 123.)  Stress gave Plaintiff headaches, and she sometimes had

trouble remembering things.  (R. 125.)

### e.    The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security

Administration under the authority of the Social Security Act (the "SSA").  First, the ALJ found

that Plaintiff had not engaged in substantial activity since May 6, 2011, the alleged onset date.

(R. 14.)  Second, the ALJ found that Plaintiff had the following severe impairments: obesity,

diabetes mellitus, arthritis and hypertension.  (R. 14.)  The ALJ explained that Plaintiff weighed

over 300 pounds, and that she suffered from "related conditions, including diabetes mellitus,

arthritis, hypertension and sleep apnea."  (R. 14.)  The ALJ summarized the medical records,

including the MRIs of Plaintiff's lumbar spine and knees, axial imaging of her left shoulder, and

Dr. Farakh's observation of limited range of motion in Plaintiff's knees.  The ALJ described

Plaintiff's treatment history for her knee pain, diabetes and infected feet.  (R. 14–15.)

### i.    Step three

At the third step, the ALJ determined that Plaintiff does not have an impairment or

combination of impairments that meets or is equal to the severity of one of the impairments listed

in Appendix 1 of the Social Security Regulations.  (R. 15.)  The ALJ considered Listings 1.04,

pertaining to disorders of the spine; 1.02, pertaining to gross deformities and joint pain disorders;

and 9.08, pertaining to diabetes-related impairments.  (R. 15–16.)  The ALJ noted that there is no

longer an obesity listing in the Social Security Regulations, but that while obesity is not per se

disabling, it can support a finding of disability in certain circumstances by having an adverse

impact upon co-existing impairments.  (R. 17.)  The ALJ considered the effect of obesity on

limitations related to the cardiovascular and respiratory systems, arthritis and daily activities. (R. 17.)

### ii. Step four

Next, the ALJ determined that Plaintiff has the residual functional capacity to perform the full range of sedentary work, as defined in 20 CFR [§§] 404.1567(a). (R. 17.) The ALJ found that Plaintiff is able to "lift and carry up to 10 pounds" and is "able to stand and walk for up to two hours during an eight-hour workday," and "sit for up to six hours during an eight-hour workday." (R. 17.)

The ALJ determined that, while Plaintiff's "medically determinable impairments could reasonably be expected" to cause Plaintiff's symptoms, Plaintiff's statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained." (R. 18.) The ALJ explained that Plaintiff had testified that the cared for her children and her own personal care, but was not able to do any household chores, and stated that Plaintiff's "subjective allegations are far in excess of what would reasonably be expected from the objective medical evidence." (R. 18.) The ALJ stated that Plaintiff displayed "little work motivation" and did "not appear to be trying to take care of her health." (R. 18.)

As to Plaintiff's degenerative disc disease, the ALJ concluded that the condition was not disabling, but because of Plaintiff's arthritis and weight, this condition reduces her RFC to sedentary work. (R. 18.) He noted that there was no evidence of herniation, fracture or deformity, of muscle wasting, asymmetry or atrophy, or of bowel or bladder dysfunction. (R. 18.) The ALJ observed that Plaintiff did not require an assistive device to ambulate and had not undergone any surgery, only physical therapy. (R. 18.) The ALJ further noted that Dr. Farakh had observed improvement in Plaintiff's shoulder and back pain, and Dr. Brown had

stated that Plaintiff had no motor or sensory abnormalities.  (R. 18.)

As to Plaintiff's diabetes, the ALJ concluded that it is not disabling.  (R. 18.)  The ALJ determined that the record did not document regular neuropathy or acidosis, amputation, or end organ damage.  (R. 18.)  The ALJ noted that Dr. Brown stated that Plaintiff had "no complications" from her diabetes.  (R. 18.)  The ALJ emphasized that Plaintiff has been "advised repeatedly to lose weight and follow a low calorie, low carbohydrate diet," but that Plaintiff "does not follow this advice" and, instead, "[h]er weight continues to climb."  (R. 18.)  The ALJ further concluded that the record reflected hypertension, but without retinopathy, cerebral vascular pathology or peripheral neuropathy.  (R. 18.)  The ALJ noted that Dr. Brown stated that Plaintiff was "doing well," and also that Dr. Feffer attributed Plaintiff's cardiac abnormalities to "severe deconditioning."  (R. 18.)

In reaching these conclusions, the ALJ accorded the opinion of the consultative internist examiner, Dr. Caiati, "great weight" because the opinion was based on a full physical examination.  (R. 19.)  The ALJ explained that Dr. Caiati found Plaintiff to be unrestricted in her ability to sit, stand, walk, reach, push, pull and climb.  (R. 19.)  The ALJ noted that Dr. Caiati observed that Plaintiff was in no acute distress, had a normal gait, was able to walk on her heels and toes, and had full strength in all extremities.  (R. 19.)  The ALJ stated that "no doctor or other treating medical professional describes the claimant as disabled or significantly restricted in her ability to engage in substantial gainful activity."  (R. 19.)  The ALJ concluded that, "[i]t appears that the claimant's main problem is her refusal to lose weight."  (R. 19.)

### iii.   Step five

At step five of the analysis, the ALJ considered Plaintiff's RFC for the full range of sedentary work, her age, education and past work experience and, relying on the

Medical-Vocational Guidelines, concluded that Plaintiff could perform "a broad range of sedentary work." (R. 20.) Therefore, the ALJ determined that from May 6, 2011 through the date of his decision, Plaintiff had not been under a "disability" as defined under the SSA. (R. 20.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or

is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

  **b. Availability of benefits**

  Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Social Security Act. To be considered disabled under the Act, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. §§ 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the

> fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims"); *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

Plaintiff moves for judgment on the pleadings, claiming that the ALJ erred in (1) failing to find that Plaintiff's spinal impairment was severe; (2) failing to find that Plaintiff's impairment meets or equals the severity of the spinal disorders in Appendix 1; (3) determining Plaintiff's RFC; (4) finding that Plaintiff's statements about the intensity, persistence and limiting effects of her symptoms were not entirely credible in assessing her RFC; and (5) determining that there is employment available in the national economy that Plaintiff can perform. (Pl. Mem. 9–20.) The Commissioner cross-moves for judgment on the pleadings, arguing that the ALJ's decision was supported by substantial evidence. (Comm'r Mem. 17–29.)

### i. The ALJ's assessment of no severe spinal impairment was harmless

Plaintiff argues that the ALJ erred because, at the second step of the sequential analysis, he did not find Plaintiff's alleged degenerative spinal disease to be severe, despite evidence that Plaintiff's lumbar stenosis had more than a minimal effect on Plaintiff's ability to do basic work activities. (Pl. Mem. 18.) The Commissioner argues that, because the ALJ identified other

severe impairments at the second step such that the sequential evaluation proceeded, and because the ALJ considered the effects of Plaintiff's spinal impairments at further steps in his analysis, any error in the ALJ's analysis at step two was harmless. (Comm'r Mem.18–19.)

At the second step of the sequential analysis, the ALJ must determine whether the plaintiff has a severe impairment that significantly limits the plaintiff's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 416.920(c). The plaintiff bears the burden to provide medical evidence demonstrating the severity of her condition. *Miller v. Comm'r of Social Sec.*, No. 05-CV-1371, 2008 WL 2783418, at *6–7 (N.D.N.Y. July 16, 2008); *see also* 20 C.F.R. § 416.912(a). Although the Second Circuit has held that the second step is limited to "screen[ing] out *de minimis* claims," *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995), the "mere presence of a disease or impairment," or a diagnosis or treatment for an impairment, are alone sufficient to render a condition "severe," *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995).

Where an ALJ excludes an impairment from the list of severe impairments at the second step, any such error is harmless where the ALJ identifies other severe impairments such that the analysis proceeds and the ALJ considers the effects of the omitted impairments during subsequent steps. *See O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) (finding that any error by the ALJ in excluding the claimant's knee injury as a severe impairment was harmless because the ALJ identified other severe impairments and considered the knee injury in subsequent steps); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding that any error by the ALJ in excluding claims of anxiety disorder and panic disorder from step two was harmless because the ALJ identified other severe impairments and specifically considered the claims of anxiety and panic attacks in subsequent steps (citing *Zabala v. Astrue*, 595 F.3d

402, 410 (2d Cir. 2010))); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (finding remand would not be warranted due to the ALJ's failure to recognize disc herniation as a severe impairment because "the ALJ did identify severe impairments at step two, so that Plaintiff's claim proceeded through the sequential evaluation process," and the ALJ considered the "combination of impairments" and "all symptoms" in making determination); *Lasiege v. Colvin*, No. 12-CV-1398, 2014 WL 1269380, at *10–11 (N.D.N.Y. Mar. 25, 2014) (holding that, even if the ALJ erred in failing to list headaches as severe impairment at step two, such error was harmless because other severe impairments were found and the ALJ explicitly noted claimant's headaches during RFC determination).

Here, at step two, the ALJ summarized the medical records relating to Plaintiff's alleged degenerative disc disease, including the February of 2013 MRI that identified spinal stenosis and her treatment with lumbar epidural steroid and cortisone injections. (R. 14.) Although the ALJ discussed these medical findings, he did not state whether he separately considered a spinal impairment and, if so, why he concluded this condition was not severe. (R. 14–15.) However, the ALJ's analysis at the subsequent steps indicates that "all symptoms" were considered including Plaintiff's lower back and shoulder pain. (*See* R. 15–16 (considering, at the third step, whether Plaintiff's impairments satisfied the listing for spinal disorders); R. 18 (discussing Plaintiff's treatment for shoulder and back pain in determining her RFC).) Because the ALJ's decision demonstrates that he considered Plaintiff's spine and back impairments in subsequent steps, any error in failing to list this impairment as a severe impairment at step two was harmless. *See O'Connell*, 558 F. App'x at 65; *Reices-Colon*, 523 F. App'x at 798; *Stanton*, 370 F. App'x at 233 n.1.

### ii. Plaintiff has not demonstrated that her impairment meets Listing 1.04

At step three of the five-step sequential process, the ALJ determines whether a claimant's impairment or combination of impairments is sufficiently severe to meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 C.F.R. § 404.1520(d). If a claimant has such an impairment, the ALJ will find the claimant disabled without considering the claimant's age, education or work experience. *Id.*; *see also DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir.1998) ("The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability." (citing 20 C.F.R. §§ 404.1520(d), 416.920(d))). Plaintiff argues that the ALJ erroneously found that Plaintiff's impairment did not meet or equal Listing 1.04,[2] subsection A or C, despite Plaintiff's positive Faber's test, nerve root compression and difficulty walking.[3] (Pl. Mem. 10–11.) The Commissioner argues that the ALJ correctly found that Plaintiff's impairment was not sufficiently severe to meet the requirements of Listing 1.04A or 1.04C. (Comm'r Mem. 19–21.)

Each listing in Appendix 1 has a set of criteria that must be met for an impairment to be deemed conclusively disabling. The claimant bears the burden of demonstrating that her

---

[2] Plaintiff asserts that her impairments also "meet or medically equal" Listing 1.02, (Pl. Mem. 10), but points to no deficiencies in the ALJ's conclusion that Plaintiff did not satisfy this Listing.

[3] Plaintiff also argues that the ALJ had an obligation to obtain the testimony of an independent medical advisor to consider whether Plaintiff satisfied the Listings. (Pl. Mem. 9.) The argument is without merit because although ALJs may consult medical experts, they are not required to do so. *See* 20 C.F.R. § 404.1527(e)(2)(iii) ("Administrative law judges *may* also ask for and consider opinions from medical experts . . . ." (emphasis added)); *see also Cole v. Astrue*, No. 06-CV-769, 2013 WL 4398974, at *4 (S.D.N.Y. Aug. 7, 2013) ("Plaintiff provides no support for his claim that [the ALJ] was *required* to consult an expert in addition to reviewing the medical evidence in the record.").

impairments meet or are equal in severity to each of the medical criteria set forth in one of the listings. *See Claymore v. Astrue*, 519 F. App'x 36, 37 (2d Cir. 2013) ("The claimant must present medical findings equal in severity to all the criteria for the one most similar listed impairment." (internal quotation marks omitted) (quoting *Brown v. Apfel*, 174 F.3d 59, 64 (2d Cir. 1999))); *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 888 (2d Cir. 2007) (noting that it is the plaintiff's burden to "demonstrate that [her] disability [meets] all of the specified medical criteria" of a spinal disorder (quoting in part *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990))). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."[4] *Sullivan*, 493 U.S. at 530.

An ALJ is required to explain his determination that a claimant failed to meet or equal the listings "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the [l]istings." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009); *see also Norman v. Astrue*, 912 F. Supp. 2d 33, 78–79 (S.D.N.Y. 2012) (examining the medical record and reversing after there was not "sufficient contradicted evidence in the record to provide substantial evidence for the conclusion that plaintiff failed to meet step three" (alteration, citation and internal quotation marks omitted)). Nevertheless, "[a]n ALJ's unexplained conclusion [at] step three of the analysis may be upheld where other portions of the decision and other 'clearly credible evidence' demonstrate that the conclusion is supported by

---

[4] However, "[e]ven if a claimant's impairment does not meet the specific criteria of a Medical Listing, it still may equal the Listing." *Ryan v. Astrue*, 5 F. Supp. 3d 493, 507 n.12 (S.D.N.Y. 2014) (quoting *Valet v. Astrue*, 10-CV-3282, 2012 WL 194970, at *13 (E.D.N.Y. Jan. 23, 2012)). Specifically, "[t]he Commissioner will find that a claimant's impairment is medically equivalent to a Medical Listing if: (1) the claimant has other findings that are related to his or her impairment that are equal in medical severity; (2) the claimant has a 'closely analogous' impairment that is 'of equal medical significance to those of a listed impairment;' or (3) the claimant has a combination of impairments that are medically equivalent." *Id.* (citation omitted).

substantial evidence.'"  *Ryan*, 5 F. Supp. 3d at 507 (citing *Berry v. Schweiker*, 675 F.2d 464, 469

(2d Cir. 1982)).  In *Berry*, the Second Circuit upheld an ALJ's decision that the plaintiff did not

meet a listed impairment, even though the ALJ failed to explain the rationale for his decision.

*Berry*, 675 F.2d at 469.  In so doing, the Second Circuit also circumscribed its holding:

> [I]n spite of the ALJ's failure to explain his rejection of the claimed
> listed impairments, we were able to look to other portions of the
> ALJ's decision and to clearly credible evidence in finding that his
> determination was supported by substantial evidence.  Cases may
> arise, however, in which we would be unable to fathom the ALJ's
> rationale in relation to evidence in the record, especially where
> credibility determinations and inference drawing is required of the
> ALJ.  In such instances, we would not hesitate to remand the case
> for further findings or a clearer explanation for the decision.  Thus,
> in future cases in which the disability claim is premised upon one or
> more listed impairments of Appendix 1, the Secretary should set
> forth a sufficient rationale in support of his decision to find or not to
> find a listed impairment.

*Id.* (citations omitted); *see also Sanders*, 506 F. App'x at 76 (declining to remand at step three

because although "the record contain[ed] evidence of nerve root compression, [it] also

contain[ed] substantial evidence supporting the conclusion that there was no nerve root

compression"); *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112–13 (2d Cir. 2010)

("Here, although the ALJ might have been more specific in detailing the reasons for concluding

that plaintiff's condition did not satisfy a listed impairment, other portions of the ALJ's detailed

decision, along with plaintiff's own testimony, demonstrate that substantial evidence supports

this part of the ALJ's determination." (citing *Berry*, 675 F.2d at 469)); *Otts*, 249 F. App'x at 889

("While the ALJ might have been more specific in detailing the reasons for concluding that [the

plaintiff's] condition did not satisfy a listed impairment, the referenced medical evidence,

together with the lack of compelling contradictory evidence from the plaintiff, permits us to

affirm this part of the challenged judgment." (citing *Berry*, 675 F.2d at 468)); *Mongeur v.

Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam) (noting that when "the evidence of

record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability"). By contrast, "where the evidence on the issue of whether a claimant meets or equals the listing requirements is equipoise and 'credibility determinations and inference drawing is required of the ALJ' to form his conclusions at step three, the ALJ must explain his reasoning." *Ryan*, 5 F. Supp. 3d at 507–08 (alteration omitted) (quoting *Berry*, 675 F.2d at 469).

### 1. Listings 1.04A and 1.04C

Listing 1.04, titled "Disorders of the spine," provides, in relevant part:

> *Disorders of the spine* (*e.g.*, herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in a compromise of a nerve root (including cauda equine) or the spinal cord. [Combined] With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). . . .
>
> * * *
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively . . . .

20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.04A, 1.04C. Thus, to establish that she meets Listing 1.04A, Plaintiff must demonstrate that she suffered (1) nerve root or spinal cord compromise, with (2) neuro-anatomic distribution of pain, (3) limitation of motion in her spine, (4) motor loss, accompanied by sensory or reflex loss, and (5) positive straight-leg raising test, because of the involvement of Plaintiff's lower back. *Id.*; *cf. Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74,

76 (2d. Cir. 2012) ("Under Listing 1.04(A), such a disorder can be demonstrated by evidence of nerve root compression accompanied by sensory or reflex loss.").  To establish that Plaintiff meets Listing 1.04C, Plaintiff must demonstrate that she suffered (1) lumbar spinal stenosis with pseudoclaudication, (2) chronic nonradicular pain and weakness, and (3) an inability to ambulate effectively.  *Id*.  As to the requirement to effective ambulation, the regulations further explain:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living [and] . . . must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(b)(2); *see Evans v. Comm'r of Soc. Sec.*, 110 F. Supp. 3d 518, 537 n.4 (S.D.N.Y. 2015) (explaining the standard for ambulating effectively).

### A.   Listing 1.04A

In considering Listing 1.04A, the ALJ simply recited the requirements and stated that "the instant claim at bar does not satisfy these listing parameters."  (R. 15–16.)  Plaintiff argues that the ALJ was wrong in concluding that Plaintiff did not have a positive straight-leg test, because Dr. Chacko noted Plaintiff had a positive Faber's test, which tests for hip and lumbar rotation, which Plaintiff argues "confirms the severity of her spinal injury."  (Pl. Mem. 10.)  Plaintiff also asserts that the MRI results examined by Dr. Farakh showed spinal stenosis, facet arthritis and left foraminal narrowing, and argues that these findings demonstrate nerve root compression.  (R. 11.)

Plaintiff has not demonstrated that her back conditions meet each medical criterion in Listing 1.04A. Whether or not Plaintiff's MRI results are sufficient to demonstrate nerve root compression as required by Listing 1.04A, the medical record does not contain evidence that Plaintiff experienced "neuro-anatomic distribution of pain" as required by Listing 1.04A, and Plaintiff presents no argument that it does. Moreover, Listing 1.04A also requires "motor loss . . . accompanied by sensory or reflex loss." *See* 20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.04A. The Listing defines "motor loss" as "atrophy with associated muscle weakness" or "muscle weakness." *Id.* Appendix 1 specifies that "significant motor loss" may be shown by an "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position." 20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.00(E)(1). Here, Plaintiff's treating record includes consistent findings that Plaintiff had normal strength and motor power. (*See* R. 204 (findings by Dr. Leventhal from January of 2013 that Plaintiff had normal strength and gait and no sensory or motor abnormalities); R. 347 (findings by Dr. Chacko stating that a neurolocic examination of Plaintiff's lower extremities was normal); R. 346 (observations by Dr. Butani that Plaintiff had full motor power in both extremities).) In the consultative examination of Plaintiff, Dr. Caiati observed that Plaintiff's gait was normal, she walked on her heels and toes without difficulty, and she used no assistive devices, although she could only squat half-way. (R. 191.)

Although the ALJ did not follow the Second Circuit's directive in *Berry* to "set forth a sufficient rationale in support of his decision to find or not to find a listed impairment," *Berry*, 675 F.2d at 469, the ALJ has not committed reversible error because Plaintiff has not demonstrated that her impairment meets each medical criterion in Listing 1.04A. *See Claymore*, 519 F. App'x at 37 (upholding the ALJ's step-three decision where the plaintiff failed to meet one criterion of the Listing); *Sanders*, 506 F. App'x at 76 (holding that where the record reflected

conflicting evidence of nerve root compression, "there is substantial evidence in the record supporting the Commissioner's decision that [the plaintiff] did not suffer from a listed impairment"). The Court finds no reversible error in the ALJ's assessment of Plaintiff's impairment under Listing 1.04A. *See Claymore*, 519 F. App'x at 37; *Otts*, 249 F. App'x at 888.

## B. Listing 1.04C

In considering Listing 1.04C, the ALJ only recited the Listing's requirements and stated that "the instant claim at bar does not satisfy these listing parameters." (R. 15–16.) Plaintiff argues that the ALJ failed to consider records that indicate Plaintiff had difficulty walking, as demonstrated by her use of a cane and her statements at the hearing before the ALJ that she had difficulty grocery shopping and could only walk three blocks before she needed to stop. (Pl. Mem. 11.) The Commissioner argues that the record does not establish that Plaintiff had an inability to ambulate effectively. (Comm'r Mem. 20.)

Plaintiff has not demonstrated that her back conditions meet *each* medical criterion in Listing 1.04 B. While her lumbar spine MRI documented spinal stenosis, Dr. Farakh noted that the condition was only "mild." (R. 194.) Moreover, whether or not the record demonstrates that Plaintiff experienced "chronic nonradicular pain and weakness," the evidence she identifies is insufficient to demonstrate an "inability to ambulate effectively." *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.04C. Plaintiff testified at the hearing that she used a cane when walking long distances, but that she could still walk for about five to ten minutes before needing to stop and rest for one or two minutes. (R. 123.) In addition, while Dr. Butani and Dr. Chacko observed that Plaintiff's gait was antalgic, (*see*. R. 345, 350), neither observed further limitation in Plaintiff's ability to walk, and Dr. Leventhal stated that Plaintiff's gait was normal, (R. 204, 211). Therefore, the record does not contain evidence that Plaintiff's spinal stenosis prevented

her from ambulating to a degree that prevented her from "carry[ing] out activities of daily living" or was analogous to an inability to walk without the use of a walker. *See Sanchez v. Colvin*, No. 12-CV-6203, 2015 WL 4510031, at *16 (S.D.N.Y. June 1, 2015) (finding that a claimant did not satisfy Listing 1.04C because he "testified that he was able to take public transportation, walk without assistance, and drive, which establish that he was able to ambulate effectively"); *Sickler v. Colvin*, No. 14-CV- 1411, 2015 WL 1600320, at *9 (S.D.N.Y. Apr. 9, 2015) ("Here, the ALJ's determination that the plaintiff fails to meet the criteria of Listing 1.04C is supported by substantial evidence. While Mr. Sickler did testify at his hearing that he had been using a cane and walking stick . . . , the medical record reveals several instances of Mr. Sickler walking without an assistive device.").

Although, as discussed above, the ALJ did not follow the instruction of *Berry* to "set forth a sufficient rationale in support of his decision to find or not to find a listed impairment," *Berry*, 675 F.2d at 469, the ALJ has not committed reversible error because Plaintiff has not demonstrated that her impairment meets the medical criterion in Listing 1.04C. Accordingly, because this is not a case "in which we would be unable to fathom the ALJ's rationale in relation to evidence in the record," the Court need not remand to the ALJ for clarification of Plaintiff's impairment under Listing 1.04. *See Salmini*, 371 F. App'x at 113 (quoting *Berry*, 675 F.2d at 469).

### iii. The ALJ's RFC determination was not supported by substantial evidence

Plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence because the ALJ (1) relied on the opinion of Dr. Caiati, whose assessment of Plaintiff's capabilities was vague, internally inconsistent and not supported by her treating records; (2) failed to develop the record by obtaining an opinion from any of Plaintiff's treating

physicians; and (3) improperly considered Plaintiff's obesity and its impact on her other conditions. (Pl. Mem. 13–17.) The Commissioner argues that the RFC determination was supported by the record and the opinion of Dr. Caiati, that the ALJ was not obligated to obtain an opinion about Plaintiff's capacities from one of her treating physicians because the record contained sufficient evidence to provide a basis for the RFC determination, and that the ALJ properly accounted for Plaintiff's obesity. (Comm'r Mem. 21–22.)

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545. With respect to a claimant's physical abilities, an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis. *Id*. § 404.1545(b). For example, "a limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id*. In determining the RFC, "the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and Plaintiff's subjective evidence of symptoms." *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 312 (W.D.N.Y. 2013) (alteration in original) (quoting *Stanton v. Astrue*, No. 07-CV-0803, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(b–e)), *aff'd*, 370 F. App'x (2d Cir 2010)). "[A]n ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) (first citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000); and then citing *Zorilla v. Chater*, 915 F. Supp. 662, 666–67

(S.D.N.Y. 1996)).

"Before an ALJ classifies a claimant's RFC based on exertional levels of work (*i.e.*, whether the claimant can perform sedentary, light, medium, heavy or very heavy work) he 'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . .'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)).  Social Security Ruling 96-8p notes that "a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions." *Id.* at 176 (quoting SSR 96–8p, 1996 WL 374184, at *4).  The Second Circuit has held that failure to conduct an explicit function-by-function analysis at the RFC finding step is not per se error requiring remand, but it has reiterated that "remand may be appropriate, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record." *Id.* at 177.

The ALJ determined that Plaintiff has the RFC to perform the full range of sedentary work.  (R. 23.)  The ALJ found that Plaintiff is able to "lift and carry up to 10 pounds" and is "able to stand and walk for up to two hours during an eight-hour workday," and "sit for up to six hours during an eight-hour workday." (R. 17.)  The ALJ concluded that neither Plaintiff's degenerative disc disease nor diabetes were disabling, explaining that "no doctor or other treating professional describe[d] [Plaintiff] as disabled or significantly restricted in her ability to engage in substantial gainful activity" and that her "main problem is her refusal to lose weight." (R. 19.)  In reaching his RFC determination, the ALJ relied on the opinion of Dr. Caiati that Plaintiff was unrestricted in her ability to sit, stand, walk, reach, push, pull and climb, and that her bending and lifting showed only "minimal to mild" limitation.  (R. 19.)  As discussed below, Dr. Caiati's

opinion does not provide substantial evidence for the ALJ's RFC determination.  In addition, the ALJ failed to develop the record.

### 1. Dr. Caiati's opinion does not provide substantial evidence for the ALJ's RFC determination

Where the opinions of nontreating and nonexamining sources are considered, the weight to which such evidence is entitled depends upon the following factors prescribed by regulation: "(1) the length, nature, and extent of the relationship between the claimant and the physician; (2) the supportability of the physician's opinion; (3) the consistency of the physician's opinion with the record as a whole; and (4) the specialization of the physician providing the opinion." *Rodriguez v. Colvin*, No. 13-CV-7607, 2015 WL 1903146, at *16 (S.D.N.Y. Mar. 31, 2015) (citing 20 C.F.R. § 416.927(c)(2)–(5)).  "An ALJ may also consider 'other factors . . . which tend to support or contradict the opinion,' such as 'the amount of understanding of [the] disability programs and their evidentiary requirements that an acceptable medical source has,' and 'the extent to which an acceptable medical source is familiar with the other information in [a claimant's] case record.'"  *Id.* (citing 20 C.F.R § 416.927(c)(6)).  In assessing the length, nature and extent of the relationship between the claimant and the physician for purposes of the first factor, "[g]enerally, . . . more weight [is given] to the opinion of a source who has examined [the plaintiff] than to the opinion of a source who has not examined [the plaintiff]."  20 C.F.R. § 416.927(c)(1); *see Selian*, 708 F.3d at 419 (stating that "ALJs should not rely heavily on the findings of consultative physicians after a single examination").

The ALJ improperly determined that Dr. Caiati's findings were entitled to "great weight." (R. 19.)  Although Dr. Caiati's opinion was rendered after examining Plaintiff on one occasion, it is contradicted by Plaintiff's treatment records and by some of Dr. Caiati's own observations. For example, Dr. Caiati opined that Plaintiff was unrestricted in her ability to walk and found

that Plaintiff's gait was normal and that she walked on her heels and toes without difficulty, (R. 191), however, both Dr. Butani and Dr. Chacko observed that Plaintiff's gait was antalgic, (R. 345, 350). In addition, Dr. Caiati found that Plaintiff's joints were stable and nontender, (R. 192), but Dr. Alencherry diagnosed Plaintiff with chronic second MTP joint bursitis, (R. 288), and Dr. Butani evaluated Plaintiff's hip joint and found pain and a limited range of motion, (R. 351). Further, Dr. Caiati noted that Plaintiff complained of lower back pain when she rose from her chair, yet concluded that Plaintiff had no limitation in standing or sitting. (R. 191.)

Moreover, Dr. Caiati's opinion that Plaintiff had a "minimum to mild" limitation in bending and lifting due to lower back pain is too vague to be entitled to "great" weight. *See Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000), *superseded by statute on other grounds*, 20 C.F.R. § 404.1560(c)(2). As the Second Circuit stated in *Curry*, "[w]hile the opinions of treating or consulting physicians need not be reduced to any particular formula, [the consultative examiner's] opinion is so vague as to render it useless in evaluating whether [claimant] can perform sedentary work." *Id.* (explaining that, "[i]n particular, [the consultative examiner's] use of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference that [claimant] can perform the exertional requirements of sedentary work").

Dr. Caiati observed that Plaintiff's lumbar range of motion was limited, with flexion to 70 degrees and with complaints of lower back pain, extension to 20 degrees, lateral flexion to 30 degrees and rotation to 30 degrees. (R. 192.) He noted that Plaintiff's straight leg raising while sitting was 90 degrees on the right and 80 degrees on the left, with complaints of lower back

pain. (R. 192.) Despite his observations, Dr. Caiati did not opine as to Plaintiff's residual capacity to bend or lift more specifically than stating that she had a "minimum to mild" limitation in these functions. Dr. Caiati's opinion, therefore, does not provide sufficient support for the ALJ's assessments that Plaintiff has the capacity to "lift and carry up to 10 pounds." *See Selian*, 708 F.3d at 421 ("[The consultative examiner's] opinion is remarkably vague. What [the consultative examiner] means by 'mild degree' and 'intermittent' is left to the ALJ's sheer speculation. . . . [The] opinion does not provide substantial evidence to support the ALJ's finding that [the claimant] could lift 20 pounds occasionally and 10 pounds frequently."); *Ubiles v. Astrue*, No. 11-CV-6340, 2012 WL 2572772, at *11 (W.D.N.Y. July 2, 2012) (holding that the consultative examiner's opinion that the plaintiff had "moderate limitations in standing, walking, climbing stairs, and lifting minor weights . . . was entirely too vague to serve as a proper basis for an RFC" (collecting cases)); *Hilsdorf*, 724 F. Supp. 2d at 348 (holding that the consultative examiner's "statement that Plaintiff had 'limitations of a mild degree of lifting, bending, walking, standing, and pushing and pulling on arm controls'" could not "serve as an adequate basis for determining Plaintiff's RFC" because it "did not provide enough information to allow the ALJ to make the necessary inference that Plaintiff could perform sedentary work"). For these reasons, Dr Caiati's opinion does not provide substantial evidence for the ALJ's RFC determination.

## 2. The ALJ's duty to develop the record

Although a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act, . . . 'because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration omitted) (first citing

*Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002); and then quoting *Melville v. Apfel*, 198

F.3d 45, 51 (2d Cir. 1999)); *see also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33

(2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts

and develop the arguments both for and against the granting of benefits.'" (quoting *Vincent v.

Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))). This duty is present "[e]ven when a

claimant is represented by counsel." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)

(collecting cases); *see Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) ("[T]he ALJ's general

duty to develop the administrative record applies even where the applicant is represented by

counsel . . . ."); *Doria v. Colvin*, No. 14-CV-7476, 2015 WL 5567047, at *7 (S.D.N.Y. Sept. 22,

2015) ("The ALJ's duty to develop the record includes a duty to resolve apparent ambiguities

relevant to the ALJ's disability determination." (citation omitted)); *Rockwood v. Astrue*, 614

F. Supp. 2d 252, 279 (N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record,

even if the claimant is represented by counsel, if the medical record is ambiguous or incomplete.

(first citing *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); and then citing *Rosa v. Callahan*,

168 F.3d 72, 79 (2d Cir. 1999))).

An ALJ does not need to affirmatively obtain the RFC opinion of a treating physician

where there are no obvious gaps in the medical history. *Swiantek v. Comm'r of Soc. Sec.*, 588

Fed. App'x 82, 84 (2d Cir 2015); *see Tankisi*, 521 F. App'x at 33–34 (holding that the absence of

a medical source statement from a claimant's treating physicians is not necessarily fatal to the

ALJ's determination); *Rosa*, 168 F.3d at 79 n.5 (explaining that the ALJ must attempt to fill

"clear gaps" in the record, but "where there are no obvious gaps . . . and where the ALJ already

possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional

information); 20 C.F.R. § 404.1520b(c)(1) (requiring the ALJ to obtain additional evidence only

if the ALJ cannot decide whether a claimant is disabled based on the existing evidence).

Nevertheless, while an ALJ may, in some circumstances, proceed without a medical source opinion as to the claimant's functional limitation, there must still be "sufficient evidence" for the ALJ to properly make the RFC determination. *See Downes v. Colvin*, No. 14-CV-7147, 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (noting that "the treatment notes and test results from Plaintiff's treating physicians do not assess how Plaintiff's symptoms limited his functional capacities" and remanding for further findings); *Sanchez v. Colvin*, No. 13-CV-6303, 2015 WL 736102, at *6 (S.D.N.Y. Feb. 20, 2015) ("Significantly, the administrative record here is a far cry from [those], which have excused the ALJ's failure to seek a treating physician's opinion based on the completeness and comprehensiveness of the record."); *cf. Swiantek*, 588 F. App'x at 84 ("Given the extensive medical record before the ALJ in this case, we hold that there were no 'obvious gaps' that necessitate remand solely on the ground that the ALJ failed to obtain a formal opinion from [the] treating physicians . . . ."); *Tankisi*, 521 F. App'x at 34 (emphasizing the "extensive record" available to the ALJ).

Here, it is unclear where the ALJ obtained support for his findings that Plaintiff was able to "lift and carry up to 10 pounds," "stand and walk for up to two hours during an eight-hour workday," and "sit for up to six hours during an eight-hour workday." (R. 17.) Other than Dr. Caiati's report, the objective medical evidence provides minimal insight into Plaintiff's functional limitations. Dr. Brown determined that Plaintiff's extremities revealed decreased range of motion and point tenderness of the left shoulder, (R. 218), Dr. Alencherry detected irritated nerves, (R. 282), and Dr. Butani observed tenderness to palpation across her lumbar spine and a decreased range of lumbar motion, (R. 351). However, as the ALJ specifically noted, none of these doctors nor any of Plaintiff's other treating physicians provided an

assessment of Plaintiff's functional limitations or described Plaintiff's restrictions "in her ability to engage in substantial gainful activity." (R. 19.) Moreover, there are other gaps in the medical record, including the records from Dr. Farakh, which omit earlier treatment of Plaintiff's lower back pain. (R. 321 (stating that Dr. Farakh had seen Plaintiff in the past regarding shoulder pain and lower back pain).)

Based on the lack of supporting functional limitation assessments, the ALJ's conclusions appear to be drawn from the absence of evidence in the record and from his own opinions, including those about Plaintiff's "refusal to lose weight," and are not supported by substantial evidence. (R. 19.) *See Jermyn v. Colvin*, No. 13-CV-5093, 2015 WL 1298997, at *20 (E.D.N.Y. Mar. 23, 2015) ("[T]he ALJ was not permitted to construe the silence in the record as to Plaintiff's functional capacity as indicating support for his determination as to Plaintiff's limitations." (citing *Rosa*, 168 F.3d at 81)). Because Dr. Caiati's opinion does not provide sufficient evidence for the ALJ's RFC determination that Plaintiff could perform the full range of sedentary work, the ALJ was obligated to develop the record and to attempt to obtain a functional capacity assessment from any of Plaintiff's treating doctors. *See Marshall v. Colvin*, No. 12-CV-6401, 2013 WL 5878112, at *9 (W.D.N.Y. Oct. 30, 2013) ("Where a treating physician has not assessed a claimant's RFC, the ALJ's duty to develop the record requires that he *sua sponte* request the treating physician's assessment of the claimant's functional capacity." (first citing *Myers v. Astrue*, No. 06-CV-0331, 2009 WL 2162541 (N.D.N.Y. July 17, 2009); and then citing *Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594 (E.D.N.Y. Sept.11, 2012))); *Aceto v. Comm'r of Soc. Sec.*, No. 08-CV-169, 2012 WL 5876640, at *16 (N.D.N.Y. Nov. 20, 2012) ("Since the ALJ had nothing more than treatment records and consultative reports to review, he had an affirmative duty to develop the record and request that Plaintiff's treating

physicians assess her RFC."). The ALJ's failure to develop the record in this manner is grounds for remand. *See Rosa*, 168 F.3d at 83 (finding remand "particularly appropriate" where the ALJ failed to obtain adequate information from treating physicians, and potentially relevant information for other doctors); *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) ("[F]ailure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case." (citing *Moran v. Astrue*, 569 F.3d 108, 114–15 (2d Cir. 2009))), *report and recommendation adopted*, No. 08-CV-8435, 2012 WL 3069570 (S.D.N.Y. July 26, 2012).

Because the ALJ's RFC determination was not supported by substantial evidence and because he failed to develop the record by getting an assessment of Plaintiff's limitations and capacities from a treating source, the Court vacates the Commissioner's decision and remands for further fact finding.

### iv. Remaining arguments

Plaintiff also argues that the ALJ erred in finding that she was not credible as to the intensity, persistence and limiting effects of her impairments and in applying the Medical-Vocational Guidelines to determine that there is employment available in the national economy that Plaintiff can perform. (Pl. Mem. 17–19.) Because the Court remands the case for further consideration of the Plaintiff's RFC and for further development of the record, the Court will not address Plaintiff's remaining arguments, as the ALJ's errors impact the Court's ability to review the ALJ's credibility determinations and application of the Medical-Vocational Guidelines.

### III. Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is denied. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 28, 2016
       Brooklyn, New York